**UNITED STATES of America, Appellee,**

v.

**Janet Leslie Cooper BYRNES, Appellant.**

**No. 822, Docket 80–1359.**

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1981.

Decided March 17, 1981.

Gustave J. DiBianco, Asst. U. S. Atty., Syracuse, N. Y. (George H. Lowe, U. S. Atty., Syracuse, N. Y., of counsel), for appellee.

Richard M. Heimann, Walnut Creek, Cal. (Tonsing & Heimann, Walnut Creek, Cal., of counsel), for appellant.

Before MULLIGAN and TIMBERS, Circuit Judges and DUFFY,* District Judge.

MULLIGAN, Circuit Judge:

Who knows what evil lurks in the hearts of men? Although the public is generally aware of the sordid trafficking of drugs and aliens across our borders, this litigation alerts us to a nefarious practice hitherto unsuspected even by this rather calloused

---

* United States District Judge for the Southern District of New York, sitting by designation.

bench—rare bird smuggling. The appeal is therefore accurately designated as *rara avis*. While Canadian geese have been regularly crossing, exiting, reentering and departing our borders with impunity, and apparently without documentation, to enjoy more salubrious climes, those unwilling or unable to make the flight either because of inadequate wing spans, lack of fuel or fear of buck shot, have become prey to unscrupulous traffickers who put them in crates and ship them to American ports of entry with fraudulent documentation in violation of a host of federal statutes.[1] The traffic has been egregious enough to warrant the empanelling of a special grand jury in 1979 in the Northern District of New York to conduct a broad investigation of these activities. Even the services of the Royal Canadian Mounted Police were mustered to aid the inquiry.

A principal target of the grand jury investigation was Kenneth Clare, a Canadian, who was believed to be in the business of shipping exotic birds into the United States, misrepresenting on import documents the value, the species and even the number of birds in the containers, thus avoiding the payment of United States Customs duties, inspection and quarantine. When one learns that an adult swan stands some four and a half feet tall and is normally ill tempered, the reluctance of a border inspector to make a head count is understandable. In this case Clare even had the audacity to pass off as Canadians, birds whose country of origin was England! Another target of the investigation was a California attorney, Edward R. Fitzsimmons, whose hobbies included the collection of horses, llamas and exotic birds. It was believed that Fitzsimmons and Clare worked together hand or claw in glove.

In February 1975, Fitzsimmons allegedly purchased from Clare four trumpeter swans and two red-breasted geese.[2] The crated birds were brought from Canada through Massena, New York, a Port of Entry in the Northern District of New York. Their entry papers were spurious. The trumpeter swans (cygnus buccinator) were described in the shipping documents as mute swans which are a less valuable variety. The birds were then airlifted to San Francisco by the Flying Tiger Lines where they were picked up by Janet Leslie Cooper Byrnes, the appellant, who was employed as a secretary by Fitzsimmons. Byrnes was a *quondam* zoologist at the London Zoo and knowledgeable about ornithological matters. When called before the grand jury on February 7, 1979, Byrnes testified that she did pick up the birds in 1975 but further stated that after driving away from the airport for ten or fifteen minutes, she heard no noises from the crates.[3] She stated that she stopped at a gas station, pried open the crates and discovered that all the birds were dead and in fact so stiff that she assumed they had been dead for some time. (D.O.A.). She promptly drove to a municipal dump where the birds were interred in unconsecrated ground.

By reason of this testimony the appellant was indicted on May 8, 1980 on four counts of false declarations before a grand jury in

---

1. E. g., 18 U.S.C. §§ 43 (transportation of wildlife taken in violation of state, national or foreign laws), 542 (entry of goods by false statements), 1001 (false or fraudulent statements to federal agencies); Food & Drugs Act, 21 U.S.C. § 111 (prevention of contagious diseases); Endangered Species Act, 16 U.S.C. § 1538 (regulating import and export of endangered species).

2. No birds have been indicted and there is no indication in the record that they were even aware of, much less participated in, the criminal activity unearthed by the grand jury. They were at least as innocent as the horses whose jockeys were bribed to discourage their best efforts at Pocono Downs. See *United States v. DiNapoli*, 557 F.2d 962, 964 n.1 (2d Cir.), cert. denied, 434 U.S. 858, 98 S.Ct. 181, 54 L.Ed.2d 130 (1977).

3. The trumpeter swan makes a noise described by a trial witness, Cherie Perie, as "*weird.*" The appellant, on the other hand, in her grand jury testimony stated that the male trumpeter during courtship "struts around with his neck and head held high and makes this *marvelous* little trumpeting sound." Transcript at 29. *De gustibus.* The mute apparently courts in silence.

violation of 18 U.S.C. § 1623.[4] After a three day jury trial before Hon. Neal McCurn, Northern District of New York, Byrnes was convicted on two counts on July 18, 1980.[5] She was sentenced to be committed to the custody of the Attorney General for a period of six months and fined $5,000 on each count. Execution of the prison sentence was suspended and the defendant was placed on probation for a period of one year on each count, the sentences to be served concurrently. This appeal followed.

## I.

Appellant does not challenge the sufficiency of the Government's proof to support the conviction. Ida Meffert, who had emigrated from Germany and had obvious difficulty with the English language, was one of four government witnesses brought from California to Syracuse, New York for this momentous trial. She testified that she was a collector of Australian parrots in Hayward, California and described these parrots as "citizens." The court interjected: "A citizen bird?" The witness answered: "Yeah, the whole birds is citizen."[6] More pointedly Mrs. Meffert testified that in February 1975 the appellant delivered four live swans and two live red breasted geese to her pursuant to an arrangement with Fitzsimmons whereby Mrs. Meffert and her husband provided room and board for some of his exotic wildlife. Mrs. Meffert was subjected to a grueling cross examination by counsel for appellant that was apparently aimed at her ornithological qualifications.[7] Mrs. Meffert testified that after a few days one of the swans died and she preserved his leg in her freezer to establish his demise.[8]

**4.** Title 18 U.S.C. § 1623(a) provides in pertinent part:

"Whoever under oath ... in any proceeding before a grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**5.** Two of the four counts of the indictment, including *appellant's testimony that the swans were mute rather than trumpeter (Count II)* and that Fitzsimmons had no business relationship with Clare (Count IV) were dismissed by the trial court prior to submission to the jury. The remaining counts related to appellant's testimony that the swans and geese were dead (Count I) and that she disposed of the allegedly dead birds at a landfill (Count IV).

**6.** There are various record references to "citizen" birds which was confusing since those at issue here were aliens. We are persuaded, however, that the word spoken was "psittacines" (parrots) and not citizens. The confusion of the scrivener is understandable.

**7.** On direct examination, the following testimony was given:

"Q. Mrs. Meffert, do you recall testifying yesterday about your definition of birds?
A. Yes.
Q. And do you recall that you said that the swans and geese were not birds?
A. Not to me.
Q. What do you mean by that, "not to me?"
A. By me, the swans are waterfowls."
Transcript at 399.
Shortly thereafter, Mrs. Meffert was cross examined as follows:

"Q. Are sparrows birds?
A. I think so, sure.
Q. Is a crow a bird?
A. I think so.
Q. Is a parrot a bird?
A. Not to me.
Q. How about a seagull, is that a bird?
A. To me it is a seagull, I don't know what it is to other people.
Q. Is it a bird to you as well or not?
A. To me it is a seagull. I don't know any other definition for it.
Q. Is an eagle a bird?
A. I guess so.
Q. Is a swallow a bird?
A. I don't know what a swallow is, sir.
Q. Is a duck a bird?
A. Not to me, it is a duck.
Q. But not a bird.
A. No, to other people maybe.
Q. Where is your husband now, ma'am?
A. Up in the room." Transcript at 400–01.

**8.** The difficulty of establishing that swans and geese were birds, a proposition not accepted by Mrs. Meffert, was obviated by a Government stipulation that both were birds.

"Let the long contention cease!
Geese are swans, and swans are geese."
*The Scholar Gypsy, The Last Word*, Stanza 2, Matthew Arnold.

The trial judge, perhaps to relieve the tension, observed that while he had enjoyed goose dinners he had never consumed swan—some indication of the limited cuisine available in the Northern District. The swan leg was not offered in evidence as an exhibit.

"Man comes and tills the field and lies beneath,
And after many a summer dies the swan." *Tithonus*, Alfred Lord Tennyson.

■ The principal argument on appeal is not that Byrnes had truthfully testified to the grand jury, but rather that her testimony was not "material" within 18 U.S.C. § 1623(a). That statute is violated only when the false statements bear upon issues under investigation by the grand jury. Appellant argues that her testimony that the birds were dead upon arrival and buried rather than delivered to Mrs. Meffert, was totally irrelevant to the grand jury investigation. The District Court rejected this contention and we affirm its finding of materiality. The leading case in this circuit addressing the question of materiality of false declarations before a grand jury is *United States v. Berardi*, 629 F.2d 723, cert. denied, —— U.S. ——, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). See also *United States v. Mulligan*, 573 F.2d 775 (2d Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978). Both parties rely upon *Berardi*, as did the District Court in finding the materiality of Byrnes' declarations. All of the elements of materiality set forth in *Berardi* are met here. As we explained in that case, the Government has the burden of establishing that the perjury was committed in response to a question within the purview of the grand jury investigation. That nexus need not be established beyond a reasonable doubt. 629 F.2d at 727. It is normally satisfied by introducing into evidence the grand jury minutes or the testimony of the foreperson of that jury. This enables the district court to determine the scope of the grand jury investigation and the relationship of the questions which elicited the perjury. *Id.* Here Judge McCurn had the benefit of the minutes as well as the testimony of the deputy foreperson and the United States Attorney in charge of the investigation.

■ Materiality is broadly construed:

"Materiality is thus demonstrated if the question posed is such that a truthful answer could help the inquiry, or a false response hinder it, and these effects are weighed in terms of potentiality rather than probability. Thus, in applying this gauge to specific situations, it is only the question, at the time of its asking, which is considered. It is of no consequence that the information sought would be merely cumulative ... or that the matters inquired into were collateral to the principal objective of the grand jury...."

*United States v. Berardi, supra*, 629 F.2d at 728 (citations omitted).

■ Measured by this broad test it is clear that the appellant's perjury here was material. The grand jury investigation was prolonged and broad in scope. Appellant's argument that it was simply limited to the importation of wildlife and had nothing to do with matters subsequent to importation is not accurate. Fitzsimmons was a target of the investigation and appellant's testimony that he had not received the birds shielded Fitzsimmons from the conspiracy charge relating to his role in the transactions in which he and Clare were allegedly involved. Moreover, had the truth been told Ida Meffert would have been identified months before her role in the matter was actually discovered. Appellant's false testimony clearly impeded and hindered the investigative efforts of the grand jury. Her perjury was therefore material within the meaning of the statute. See *Carroll v. United States*, 16 F.2d 951, 953 (2d Cir.), cert. denied, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927).

## II.

■ Appellant's remaining arguments are even less meritorious. In his opening to the jury, while explaining the background of the case, the prosecutor stated that Kenneth Clare had pleaded guilty to falsifying shipping documents. Appellant immediately moved for a mistrial; Judge McCurn denied the motion, but admonished the jury to disregard the prosecutor's remark, pointing out that "the guilt or innocence of any of these parties is not binding on the young lady." In the three day trial that followed,

the Government never mentioned Clare in its case or on summation. In view of the strength of the Government's perjury case and appellant's concession of the sufficiency of evidence to support her perjury, it is apparent that even if any error was committed it was harmless and did not warrant the granting of a new trial. *United States v. Frascone*, 299 F.2d 824, 828 (2d Cir.), cert. denied, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

■ Finally, appellant urges that the trial judge committed reversible error by not taking judicial notice of Migratory Bird Permit Regulations, 50 C.F.R. Part 21 (1979) which require the registration of trumpeter swans and the obtaining of permits for their possession and disposal. Mrs. Meffert admitted that she had never registered the swans but also stated that she was unaware that any such regulations were in existence. Appellant argues that since they were not registered Mrs. Meffert never possessed the trumpeter swans. The argument is totally unpersuasive. Count II, charging appellant with false testimony that the swans were mute rather than trumpeters, was withdrawn from the jury. Thus, the relevance of the registration was minimal. Furthermore, Mrs. Meffert admitted that the swans weren't registered. Therefore, the point was made and her conceded ignorance of the Migratory Bird regulations hardly establishes that she didn't possess the swans which she didn't consider birds in any event.[9] The existence of the regulations was irrelevant and whether or not Mrs. Meffert violated them would only confuse the issue before the jury. The trial judge has broad discretion in these matters

and he committed no abuse of discretion in refusing to take judicial notice of the regulations or submitting them to the jury. See *United States v. Albergo*, 539 F.2d 860, 863 (2d Cir. 1973), cert. denied, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976); *United States v. Bowe*, 360 F.2d 1, 15 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966).

The judgment of conviction is affirmed, justice has triumphed and this is my swan song.

---

9. For a liberal construction of the term "birds," by a Canadian court *see Regina v. Ojibway*, 8 Criminal Law Quarterly 137 (1965–66) (Op. Blue, J.), holding that an Indian who shot a pony which had broken a leg and was saddled with a downy pillow had violated the Small Birds Act which defined a "bird" as "a two legged animal covered with feathers." The court reasoned that the statutory definition

> "does not imply that only two-legged animals qualify, for the legislative intent is to make two legs merely the minimum requirement.... Counsel submits that having re-

gard to the purpose of the statute only small animals 'naturally covered' with feathers could have been contemplated. However, had this been the intention of the legislature, I am certain that the phrase 'naturally covered' would have been expressly inserted just as 'Long' was inserted in the Longshoreman's Act.

> "Therefore, a horse with feathers on its back must be deemed for the purpose of this Act to be a bird, *a fortiori*, a pony with feathers on its back is a small bird." *Id.* at 139.